FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

JUN 18 2010

Stephan Harris, Clerk
Cheyenne

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| BEAVER CREEK LAND & CATTLE, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | |
| vs. ) | No. 08-CV-00202J |
| ) | |
| ) | |
| PHILLIP A. WOLF, ) | |
| ) | |
| Defendant. ) | |

### OPINION STATING FINDINGS OF FACT
### AND
### CONCLUSIONS OF LAW

The above captioned matter came before the Court for trial without a jury on May 26, 2010. Bret F. King appeared for plaintiff; defendant did not appear. Having carefully considered the evidence presented, the applicable law, the pleadings of record and the argument of counsel, the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Beaver Creek is a Wyoming limited liability company whose principals

are Anthon Stauffer and Josh Romney. Both Mr. Stauffer and Mr. Romney were present for trial although only Mr. Stauffer testified.

2. Phillip Wolf is a resident of the State of Colorado. Mr. Wolf did not appear for trial.

3. Mr. Stauffer has substantial experience in the location, acquisition and resale of properties that are particularly suited for conservation purposes. He locates such properties which he works to acquire either alone or with other investors, which properties are then improved and resold or held for investment and then resold. Such properties include properties in and around Star Valley, Wyoming and a large ranch near Mountain View, Wyoming of approximately 20,000 deeded acres which has been resold to a conservation buyer.

4. The Lost Peaks Ranch near Thermopolis, Wyoming (also known as the High Island Ranch) is by all accounts a "spectacular" ranch consisting of approximately 76,000 deeded acres and an additional 75,000 acres leased from various governmental agencies including the Bureau of Land Management (the "Property"). The Property was described as having all of the attributes desired by a high-end recreational or conservation type buyer which included excellent hunting for elk, deer, antelope and big horn sheep and fishing as well as cattle production.

2

5. On or about March 24, 2008, the Plaintiff entered into a Real Estate Purchase Contract with the owner of the Property, Frank and Karen Robbins. See Trial Exhibit 31, hereinafter referred to as the "Robbins Contract". The purchase price of the Property was $50,000,000.00.

6. Mr. Robbins was represented in the sale by licensed real estate broker Frank Deede. Mr. Deede spent nearly two years looking at numerous ranch properties throughout the United States to find acceptable replacement property for Robbins to acquire should the Property sell. Mr. Deede testified that few if any other ranches were comparable to the Property.

7. After entering into the contract with Robbins, the Plaintiff spent a significant amount of time and money to market the Property to a potential buyer. Such included compiling an extensive history of the ranch, the status of all water and mineral rights, pro formas for the cattle operation and the gravel pit, touring and photographing the ranch and preparing an extensive brochure. See Trial Exhibit 35. The property was marketed by Plaintiff as the "Lost Peaks Ranch." The Plaintiff sought a potential buyer who would either purchase the Property from the Plaintiff at an increased price or purchase the property from Robbins with Plaintiff receiving a partnership interest in the ranch for its efforts.

8. After entering into the Robbins Contract, Jeff Bretherton contacted

3

Anthon Stauffer and referred the Defendant, Phillip Wolf, as a potential buyer. Mr. Bretherton told Mr. Stauffer that he personally knew Phillip Wolf and that Mr. Wolf had expressed an interest in this type of property and that based upon his dealings with Mr. Wolf, Mr. Wolf was financially capable of acquiring a ranch of this magnitude and price.

9. Mr. Bretherton testified that he had worked with Phillip Wolf on estate planning and gifting while working for St. John's University in Minnesota; that while Bretherton was employed with the Rocky Mountain Elk Foundation he worked with Phillip Wolf who made a pledge of three million dollars to the Rocky Mountain Elk Foundation; that he had seen signed financial statements of Phillip Wolf and that Phillip Wolf was financially capable of acquiring the Property; that from discussions with Phillip Wolf, he understood Phillip Wolf to be a highly successful and sophisticated businessman who owned several new car dealerships and had recently sold some in Colorado; that he owned a large tract of property in Colorado that had a valuable gravel pit; and that Phillip Wolf owned his own private airplane. Mr. Bretherton conveyed all of this information to Anthon Stauffer.

10. Section 24(b) of the Robbins Contract, Trial Exhibit 31, provided a due diligence deadline of May 20, 2008 at 5:00 p.m., by which time the Plaintiff

4

could perform any and all due diligence. Up to that date and time, the Plaintiff could terminate the contract for any reason and receive back its earnest money deposit of $50,000. After that date and time, the earnest money deposit would be non-refundable.

11. Following the execution of Trial Exhibit 31, the Plaintiff at some time began negotiations with Phillip Wolf. Phillip Wolf came to the ranch with his wife and grandchildren and the Plaintiff paid for a helicopter tour of the ranch with Phillip Wolf. Following a tour of the ranch Phillip Wolf attended a dinner with Frank Robbins and Anthon Stauffer. Sometime following that inspection, Phillip Wolf had discussions with Anthon Stauffer wherein he indicated he wanted to buy the ranch. He asked Anthon Stauffer how much he was paying for the ranch and Mr. Stauffer did not disclose the actual purchase price but stated that the amount he was paying "begins with a five" and that any offer made by Phillip Wolf would have to "begin with a six". Phillip Wolf verbally offered to purchase the ranch for $62,500,000.00 to which the Plaintiff agreed.

12. At the time of the referral of Mr. Wolf by Mr. Bretherton, Mr. Stauffer and Mr. Romney were dealing with another potential buyer, John Miller, whom they knew to be financially capable and who was willing to purchase the ranch. At the time Phillip Wolf agreed to purchase the property, Mr. Miller had also

5

agreed to purchase the property directly from Robbins for $50,000,000.00 and for the work performed by Plaintiff, the Plaintiff would receive an ownership interest in the property. Based in part upon the representations of Phillip Wolf that he would close the purchase and in part on the fact that the Plaintiff would make a larger profit with the sale to Phillip Wolf than by taking an ownership interest with Mr. Miller, Mr. Stauffer and Mr. Romney decided for the Plaintiff to contract with Phillip Wolf. Mr. Miller was informed and the potential for that deal ended.

13. A draft of a purchase contract was to be prepared by Plaintiff's attorney to reflect the purchase price of $62,500,000.00 and sent to Phillip Wolf.

14. Prior to executing the Purchase and Sale Agreement, Trial Exhibit 1, Phillip Wolf told Anthon Stauffer that he would not be able to close by the closing date of the Robbins Contract, May 30, 2008. Anthon Stauffer contacted Frank Robbins and sought and received an extension of the closing until June 30, 2008. To obtain that extension, Beaver Creek had to increase its earnest money deposit from $50,000.00 to $70,000.00 which would become immediately non-refundable. See Trial Exhibit 33.

15. Prior to increasing the earnest money and agreeing that such would

6

become nonrefundable on the Robbins Contract, Anthon Stauffer discussed this fact with Phillip Wolf and sought and received assurances from Phillip Wolf that he would be able to close the transaction by June 30. Based upon those assurances, the Plaintiff executed Trial Exhibit 33 and paid its earnest money to the escrow agent. See Trial Exhibit 30.

16. Mr. Stauffer had an attorney for Beaver Creek prepare a draft contract for purchase of the ranch for $62,500,000.00. A draft was sent to Mr. Wolf for review.

17. On May 19, 2008 at approximately 9:22 p.m., Mr. Wolf faxed to Anthon Stauffer a copy of the contract with a cover page and one page of hand written notes. On the cover page Mr. Wolf wrote "Anthon here are a couple of changes. Phil. Attorney read them to me hopefully I wrote good enough." The handwritten notes on page two of Trial Exhibit 27 is the language Mr. Wolf's attorney apparently dictated to him. Mr. Wolf's hand-written notes indicate that he did have legal counsel review and revise the purchase contract.

18. Phillip Wolf executed a purchase and sale agreement on May 20, 2008 with the Plaintiff to purchase the Lost Peaks Ranch for $75,000,000.00. See Trial Exhibit 1, together with Addendum A, hereinafter referred to as the Wolf Purchase Agreement.

19. Addendum A of the Wolf Purchase Agreement provided that the purchase price was $75,000,000.00 and of that amount would pay the seller a total of $62,500,000.00 for the property and the difference of $12,500,000.00 would be held in escrow and returned to the buyer to be used for making improvements to the property and making other property consolidations and acquisitions primarily with the BLM.

20. The Wolf Purchase Agreement contained no contingencies and there were no preconditions to Phillip Wolf's obligation to close on the purchase of the property. The date and place of the closing was June 30, 2008.

21. Anthon Stauffer testified that during the discussions between Mr. Stauffer and Phillip Wolf, Phillip Wolf was informed and knew clearly that his funds would be needed and used to acquire the property from the Robbins'. Mr. Robbins was also aware of this arrangement and insisted on Phillip Wolf providing proof of his funds in order to extend the closing of the Robbins Contract past the contract date of May 20, 2008. This understanding between Plaintiff and Phillip Wolf is also reflected in two exhibits:

a. Trial Exhibit 37: An e-mail from Anthon Stauffer to Phillip Wolf asking that Phillip Wolf provide a cover document acknowledging that "Phil Wolf is partnering with Beaver Creek Land & Cattle, LLC,

8

for the closing of Frank Robbins' ranch" and that from the $75 million in bonds converted by Phillip Wolf a "portion will be used for the closing of the Robbins transaction and the remainder will be used for ranch improvements and additional acquisitions."

b. Trial Exhibit 2: A letter from and signed by Phillip Wolf dated May 20, 2008, which states "Phil Wolf is acting in concert with Beaver Creek Land & Cattle, LLC for the closing of the Frank Robbins ranch located in Hot Springs County, WY and is relying on the (sic) these instruments for closing and settlement of the purchase agreement between Frank Robbins and Beaver Creek Land & Cattle, LLC." The letter further reads "The amount of bonds being converted are (sic) significantly different than the purchase price between Frank Robbins and Beaver Creek Land & Cattle, LLC. Though only a portion of these funds will be used for settlement of Frank Robbins' ranch, it is Phillip Wolf's intent to demonstrate to Mr. Robbins proof of funds to close and settle the transaction."

22. Following execution of the Wolf Purchase Agreement, Phillip Wolf had several communications over the telephone, by text messaging and e-mail with Anthon Stauffer, wherein Phillip Wolf repeatedly assured Mr. Stauffer that he

had access to funds that would allow him to close his purchase of the property.

23. Whether or not Phillip Wolf ever actually had funds available to him to close the transaction is of no significance. The Wolf Purchase Agreement which he signed contains no financing contingency of any kind. Indeed, both before and after Phillip Wolf executed the Wolf Purchase Agreement, he represented that he had the funds to purchase the property and knew Plaintiff relied upon those representations to enter into the Wolf Purchase Agreement.

24. That the Plaintiff terminated a potential partnership with John Miller is additional evidence of the damage sustained by Plaintiff due to Phillip Wolf's representations, execution of the Wolf Purchase Agreement, and subsequent failure to close.

25. Following execution of the Wolf Purchase Agreement by the parties, Phillip Wolf made continuous representations to the Plaintiff that he could access the funds to close the sale of the property. See Trial Exhibit 22.

26. Prior to the closing scheduled for June 30, 2008, Linda Ottley of Uinta Title and Escrow, the closing agent for this transaction, prepared the closing documents for the closing and obtained the title commitment and insurance for the transaction. The closing documents were transmitted to Phillip Wolf who indicated that his funds would arrive for the closing. See Trial Exhibits 50 and

54.

27. On the morning of June 30, 2008, Linda Ottley spoke with Phillip Wolf about the pending closing. Phillip Wolf did not indicate that he would not close but instead indicated that he did not want the warranty deed recorded.

28. On June 30, 2008, the date of the closing, Anthon Stauffer and Josh Romney, representing the Plaintiff, drove to Evanston, Wyoming, for the closing. Phillip Wolf did not attend.

29. Linda Ottley testified that the Plaintiff was ready, willing and able to close the transaction. She testified that the closing of the Robbins Contract was occurring simultaneously in Thermopolis, Wyoming, and that Robbins was ready, willing and able to close the transaction on that sale once Phillip Wolf's funds arrived for the closing.

30. When neither Mr. Wolf nor his funds for the closing arrived, Ms. Ottley initiated a conference call with Phillip Wolf, Mr. Robbins, Anthon Stauffer, Josh Romney and herself. Phillip Wolf expressed surprise that his funds had not arrived and said that he would check on the status of his wire transfer.

31. The Defendant's funds never were sent and Phillip Wolf defaulted on the Wolf Purchase Agreement.

32. The Plaintiff had contracted to pay Robbins $50,000,000.00 for the

11

property. Phillip Wolf had contracted to purchase the property from Plaintiff for $62,500,000.00.

33. Phillip Wolf knew his funds were to be used by Plaintiff to acquire the property from Robbins in a simultaneous closing.

34. Frank Deede testified that the effect of Phillip Wolf's failure to close had significant and far reaching consequences for Robbins, who had agreed to purchase a ranch in Montana. Mr. Deede testified that the Robbins' lost their earnest money deposit for that purchase and that the Montana ranch owners selling to Robbins had contracts to purchase in Texas and that transaction could not occur.

35. Jeff Bretherton testified that as recently as February, 2010, during the pendency of this lawsuit, Phillip Wolf was looking to acquire other property in the Star Valley, Wyoming, area and that Mr. Wolf had indicated he would use his access to the same 'treasury bonds' that Phillip Wolf represented he would use to close the transaction in this case.

36. Trial Exhibit 1, the Wolf Purchase Agreement, provides that if "Buyer fails to close its purchase of the Property on or before the Closing Date, the Earnest Money shall be released to Seller, which Seller may retain in addition to any and all other remedies available to Seller in law or equity."

12

37. Phillip Wolf breached the Wolf Purchase Agreement.

38. The Plaintiff, as Seller under the Wolf Purchase Agreement, is entitled to the benefit of its bargain, or an amount for damages that would put the Plaintiff in the same position as if Phillip Wolf had performed the contract.

39. The benefit of Plaintiff's bargain in this case was the difference between the price for which Plaintiff contracted to purchase the Property from the Robbins and the price for which Plaintiff contracted to sell the Property to the Defendant. Had Phillip Wolf performed his obligations under the Wolf Purchase Agreement, the Plaintiff would have earned a profit of $12,500,000.00.

## CONCLUSIONS OF LAW

1. The Plaintiff entered into a valid and binding Real Estate Purchase Contract dated March 24, 2008, with sellers Frank and Karen Robbins (hereinafter the "Robbins Contract"), for the purchase of the IID High Island Ranch consisting of approximately 76,268 deed acres located in Hot Springs County, Wyoming (the "Property"). The purchase price of the Ranch was $50,000,000.

2. Sometime after the execution of the Robbins Contract, Plaintiff and

13

Phillip Wolf negotiated the terms of a purchase of the Property by Phillip Wolf. Mr. Wolf offered to purchase the property for $62,500,000.00, which was agreed to between the parties.

3. Plaintiff and Phillip Wolf then entered into a Purchase and Sale Agreement and Addendum (the "Wolf Purchase Agreement") which was duly executed by Plaintiff and Phillip Wolf on May 20, 2008. See Trial Exhibit 1.

4. The Wolf Purchase Agreement is a valid and binding contract for the Plaintiff to sell to Phillip Wolf, and Phillip Wolf to purchase from the Plaintiff. The clear and unambiguous terms of the Wolf Contract provided that the Plaintiff as Seller would be paid $62,500,000.00 from the closing proceeds and that closing would occur on June 30, 2008.

5. The Wolf Contract contained no contingencies or preconditions to Phillip Wolf's obligations to close the sale of the Property. Article 5.1.2 of the Wolf Contract reads "This Agreement, when duly executed by Buyer, shall constitute a valid, legal and binding obligation of Buyer, and shall be enforceable."

6. Prior to his execution of the Wolf Contract, Phillip Wolf had discussions with Anthon Stauffer wherein it was explicitly made known to Phillip Wolf that his purchase funds would be used by the Plaintiff to acquire the Property from the Robbins. This understanding and agreement is referenced in the Addendum

14

to the Wolf Contract and written communications between Phillip Wolf and Mr. Stauffer. See Trial Exhibits 1, 2, and 37.

7. Before executing Trial Exhibit 1, Phillip Wolf knew and understood that the Plaintiff was intending to make a profit from the transaction by purchasing the Ranch from the Robbins and selling it to Phillip Wolf at a higher price.

8. Prior to the date for performance under the Wolf Contract, Plaintiff engaged in conduct that constituted performance of all Plaintiff's obligations under the Wolf Contract. At the time of closing on June 30, 2008, the Plaintiff was ready, willing and able to close the purchase of the property and to convey the property to Phillip Wolf and to fulfill all of its obligations to Phillip Wolf.

9. At the time of the closing on June 30, 2008, Frank Robbins was ready, willing and able to convey the Property and fulfill all of his obligations as seller pursuant to the Robbins Contract.

10. Defendant materially breached the Wolf Contract by failing to tender the purchase price at closing. At the appointed time and place for the closing Phillip Wolf did not attend and his promised funds did not arrive.

11. The Wolf Contract is not lacking under the Statute of Frauds of this State, nor is said Contract vague, uncertain, or unenforceable.

12. Phillip Wolf without excuse or justification breached the Wolf Contract

15

and the Plaintiff is entitled to compensatory damages caused by his breach.

13. The proper measure of compensatory damages is the benefit of Plaintiff's bargain, or the amount calculated to put the Plaintiff in the same position as if the contract had been performed by Phillip Wolf, less proper deductions. Stone v. Devon Energy Production Co., L.P., 181 P.3d 936, 944 (Wyo. 2008) (citing Capshaw v. Schieck, 44 P.3d 47, 52 (Wyo. 2002)). The damages should compensate the Plaintiff for the loss which would have been prevented had Phillip Wolf fully performed the contract. Id., McCullough v. Golden Rule Ins. Co., 789 P.2d 855, 865 (Wyo. 1980); Reed v. Wadsworth, 554 P.2d 1024, 1035 (Wyo. 1976); Piroschak v. Whelen, 106 P.3d 887, 893 (Wyo. 2005).

14. In this instance the loss of the bargain suffered by the Plaintiff is the profit Plaintiff would have made had Phillip Wolf closed on the purchase of the Property, or the difference between the amount Plaintiff was purchasing the Property for and the amount for which the Plaintiff was selling the Property to Phillip Wolf. McCain v. Cox, 531 F. Supp 771, 783 (N.D.Miss. 1982)(citing Am. Jur. 2d Vendor & Purchaser § 489, p. 14-16 (1975) (Mississippi law applied in factually similar context). See also McCullough v. Golden Rule Ins. Co., 789 P.2d at 865.

16

15. The profit the Plaintiff would have made on the Wolf Contract was the difference between the amount of the purchase price on the Robbins Contract and the amount of the Wolf Contract, which is $12,500,000.00.

16. There are no deductions or set offs to be applied against the expected profit of $12,500,000.00.

17. The Plaintiff is entitled to judgment against Phillip Wolf in the amount of $12,500,000.00.

18.  Where there is no provision in the parties' contract for the recovery of interest, and where the amount of the judgment is liquidated, prejudgment interest may be awarded. Dunn v. Rescon Technology Corp., 884 P.2d 965 (Wyo. 1994) (quoting O's Gold Seed Company v. United Agri-Products Financial Services, Inc., 761 P.2d 673, 677 (Wyo. 1988)). The Court finds and concludes that Plaintiff is entitled to recover prejudgment at the rate of 7% per annum, Wyo. Stat. § 40-14-106(e),[1] from the date that the contract should have closed, June 30, 2008, to the date of entry of judgment herein.

19.  Plaintiff is entitled to post-judgment interest at the statutory rate of

---

[1]Wyo. Stat. § 40-14-106(e) provides:

(e)  If there is no agreement or provision of law for a different rate, the interest of money shall be at the rate of seven percent (7%) per annum.

17

_3.3_% per annum, from the date of entry of judgment, pursuant to 28 U.S.C. § 1961, as well as the costs of this action, pursuant to Fed. R. Civ. P. 54.  The parties shall bear their own attorney's fees and costs not authorized by Fed. R. Civ. P. 54.

20.  Plaintiff shall submit its Bill of Costs within ten (10) days of entry of judgment.

Dated this __18th__ day of ___June___ 2010.

UNITED STATES DISTRICT JUDGE